Horizon House-Microwave, Inc. *vs.* Emil Bazzy;
William Bazzy & others,[1] third-party defendants.

Plymouth.   September 18, 1985. — December 9, 1985.

Present: Kass, Kaplan, & Smith, JJ.

*Corporation,* Close corporation, Minority stockholder, Merger. *Fiduciary.*
*Practice, Civil,* Complaint. *Consumer Protection Act,* Availability of
remedy.

A complaint by a minority stockholder in a close corporation against the
corporation, the majority stockholder, a second corporation in which
the plaintiff and the defendant stockholder held a minority and a majority
interest respectively, and a wholly-owned subsidiary of the second cor-
poration, alleging that a triangular corporate merger following which
only the second corporation survived was illegal and that the majority
stockholder had abused his fiduciary duty, resulting in the dilution of
the minority stockholder's interest in the surviving corporation, was
sufficient to state a claim for relief against the surviving corporation.
[195-196]

Where a wholly-owned subsidiary of a corporation had entered into an
agreement with a second corporation pursuant to which the second cor-
poration was merged into the subsidiary, where subsequently the sub-
sidiary was merged into the first corporation in accordance with the
provisions of G. L. c. 156B, § 82, and where there was no fraud, gross
inequity, or injury to a minority stockholder as a result of the transaction,
the triangular merger was not invalid as to the surviving corporation for
failure to comply with G. L. c. 156B, § 78 (*c*) (1) (ii) and (iii), and
§ 78 (*c*) (2) (ii). [196-198]

The majority stockholder of a close corporation who arranged a triangular
corporate merger which resulted in a minority stockholder in the corpo-
ration receiving cash and a note in exchange for his original stock, while
the majority stockholder, in exchange for his original stock, received
shares of stock in the surviving corporation did not thereby breach his

---

[1] William Bazzy, Horizon House, Inc., and Horizon House Dedham,
Inc., were brought into the litigation as defendants, together with Horizon
House-Microwave, Inc., to a counterclaim filed by Emil Bazzy. See Mass.
R.Civ.P. 13(h), 365 Mass. 759 (1974).

fiduciary duty to the minority stockholder, where there was no dispute that the book value of the stock paid to the majority stockholder nearly equalled the cash and note paid to the minority stockholder, where the minority stockholder had agreed to almost identical terms three years earlier and introduced no evidence to support his contention that the market value of the stock was now higher, where there was a legitimate business purpose for structuring the merger as it was, and where the minority stockholder failed to avail himself of the appraisal remedy afforded by G. L. c. 156B, §§ 86-98. [198-200]

CIVIL ACTION commenced in the Superior Court on December 6, 1977.

The case was heard by *Joseph Ford*, J.

*Nicholas A. Abraham (Brigitte M. Gulliver* with him) for Emil Bazzy.

*Edward P. Leibensperger (Ellen G. Grant* with him) for the plaintiff.

KASS, J.   What we have here is not so much a corporate "freeze out" case as a "squeeze down" case. Emil Bazzy complains that the end product of a triangular corporate merger was a dilution of his common stock holdings in Horizon House-Microwave, Inc. (Microwave), a close corporation in which his brother, William, was the controlling officer and stockholder. The claim in substance, is that William used his dominant position in a fashion which violated the fiduciary duty of a majority stockholder to Emil, a minority stockholder in a close corporation. See *Donahue* v. *Rodd Electrotype Co.,* 367 Mass. 578, 585-586 (1975); *Wilkes* v. *Springside Nursing Home, Inc.,* 370 Mass. 842, 848-849 (1976).

Although the litigation was initiated by Microwave against Emil, so much of it as survives on appeal arises out of a counterclaim by Emil against Microwave, William, and two related corporations. A judge of the Superior Court, sitting without jury, determined that the merger was lawful and judgment entered for the defendants on Emil's counterclaim. Emil appealed. Many of the salient facts were stipulated. As to others, we rely on the facts found by the trial judge. Mass.R.A.P. 52 (a), 365 Mass. 816 (1974).

Fraternity had obviously given way to contention between the Bazzy brothers. In 1958, happier days for them, they had

organized a corporation, Horizon House, Inc. (Horizon), to pursue a magazine publishing venture. Horizon issued 420 shares to William and 410 shares to Emil. Horizon's immediate purpose was to publish a trade magazine about microwave technology, an area of knowledge with which Theodore S. Saad, an acquaintance of William, was conversant. Should the microwave magazine be successful, the Bazzy brothers agreed with Saad to "place" it in a separate corporation in which Saad would receive stock. Success did smile on the microwave magazine enterprise and in 1962 the Bazzy brothers organized Microwave. Voting stock in Microwave was issued as follows: William, 3,000 shares; Emil, 1,000 shares; Saad, 1,000 shares.[2]

After the organization of Microwave, Horizon's functions were reduced to providing space (i.e., as a landlord) and book-keeping and administrative services to Microwave and two other affiliated corporations.[3] The operating companies paid rent and service fees to Horizon.

By 1974, Emil and William were entangled in multiple law suits. Saad, although not in the line of fire between Emil and William, was stimulated to agitate for the termination of the services rendered by Horizon to Microwave, since that arrangement drained cash from Microwave, in which Saad had an interest, to Horizon, in which he did not. Horizon would then have little, if any, reason for continued existence. In June, 1974, the parties struck a deal: Microwave would buy Emil's shares in Horizon for book value plus $10,000, to be paid for in cash and a note.[4] William's shares would be acquired for

[2] In addition, Emil and Saad each received 2,000 shares of nonvoting stock. A James Hughes was issued 75 shares of nonvoting stock.

[3] Horizon's other customers were (a) Horizon House Solid-State, Inc., which Emil, William, and Saad had organized and capitalized along the lines of Microwave, and (b) Warrene Presse, Inc., a printing company which Emil controlled. Solid-State's purpose was to publish a trade journal having to do with solid state technology. That magazine was not a success and disappeared from the scene in 1964.

[4] Seventy-two percent of the amount due Emil was to be paid in the form of a note.

book value, without a premium, in exchange, solely, for stock of Microwave, the exchange ratio of Microwave stock for Horizon stock to be computed on the basis of the book value of Microwave stock. Microwave would then own Horizon as a wholly-owned subsidiary, thus putting at rest Saad's concern about cash flowing away from Microwave.[5]

Whatever merit Emil saw in the settlement agreement which the parties had signed in June, 1974, he no longer recognized, at least as to details of execution, when he came to the closing table on November 14, 1974. He declined a tender of cash and a note for his Horizon stock and the players were locked in their corporate vessels. As the statutory scheme then stood, "The vote of two thirds of each class of stock of each constituent corporation outstanding and entitled to vote on the question" was necessary to approve a merger agreement. G. L. c. 156B, § 78 (*c*) (1) (iii), as appearing in St. 1969, c. 392, § 19. William owned only a simple majority in Horizon, and, thus, could not effect the end of Horizon's independent status through a merger agreement.[6] A way out of the uneasy deadlock developed in 1976 when the Legislature amended G. L. c. 156B, § 78 (*c*) (1) (iii)), to permit authorization of merger agreements by vote of a majority, rather than two thirds, of each class of stock entitled to vote on the question. St. 1976, c. 327. A decisive vote was now possible in Horizon.[7] So far as the record discloses, Microwave was similarly able to act. William owned a majority of Microwave's voting stock at all times and, moreover, by 1977, Saad had more or less thrown in his lot

---

[5] One could ask why Microwave could not have met Saad's objection simply by ending the service arrangement with Horizon. Such a step, however, was likely to engender protest from Emil, who would find his interest in Horizon converted to a dry asset. Moreover, for so long as Microwave occupied real estate in a tenant relationship with Horizon, it was bound to pay Horizon something.

[6] Nor, for that matter, did any of Emil, William, or Saad alone have two thirds of the voting stock in Microwave.

[7] In 1981, the requirement was raised back to a two thirds vote, unless a lesser proportion, but not less than a majority, is provided for in the articles of organization. See St. 1981, c. 298, § 4.

with William. Saad and Emil each owned 1,000 shares of nonvoting stock and a James Hughes owned 75 shares of nonvoting stock. By reason of an amendment to § 78 (*c*) (1) enacted in 1975,[8] there is reason to think that the affirmative vote of a nonvoting class would have been required if the consequence of the merger were a dilution of equity of the nonvoting stock, i.e., this would be an adverse effect. Cf. *DuVall* v. *Moore*, 276 F. Supp. 674, 686 (N.D. Iowa 1967), in which the court reasoned that the considerations for permitting nonvoting stock to vote on fundamental affairs are more persuasive when the corporation is closely held. Contrast *Booma* v. *Bigelow-Sanford Carpet Co.*, 330 Mass. 79, 82 (1953), decided under a superseded corporate statute. So far as the nonvoting stock was concerned, there was a potential bare majority available for a vote in favor of the merger. Emil — and it was his burden — adduced no evidence to the contrary. In any event, as will appear, the stockholders of Microwave were not called upon to take a vote under § 78.

During the period following the breakdown of the 1974 agreement, Saad's grievance about money flowing, to his detriment, from Microwave to Horizon, continued to fester, and he threatened to initiate a stockholder's derivative suit against Microwave. There existed, therefore, a good business reason for Microwave in some fashion to close down Horizon's operations.

Microwave adopted a triangular merger as the means to that end. First, it effected the formation of a wholly owned subsidiary, Horizon House Dedham, Inc. (Dedham). Second, Dedham, by the vote of its sole stockholder, and Horizon, by a vote of a majority of shares issued and outstanding, entered into a merger agreement dated June 27, 1977, pursuant to

---

[8] See St. 1975, c. 70, § 2, which added to § 78 (*c*) (1) (iii) two sentences: "If any such agreement would adversely affect the rights of any class of stock of either constituent corporation, the vote of two thirds of such class, voting separately, shall also be necessary to authorize such agreement. For this purpose any series of a class which is adversely affected in a manner different from other series of the same class shall, together with any other series of the same class adversely affected in the same manner, be treated as a separate class." The 1976 amendment which lowered the required vote from two-thirds to a majority applied to these "other" classes.

which Horizon would be merged into Dedham. For Emil's stock in Horizon, the surviving corporation, Dedham, would exchange $29,901.26 in cash and $76,888.97 in a note of Dedham (payable in five equal annual installments with a floating rate of interest on the unpaid balance of two percent above the prime rate). For William's Horizon stock, Dedham would exchange 5,475 shares of voting common stock of Microwave.[9] Third, Dedham would change its name to Horizon House, Inc. Articles of merger to this effect were filed June 27, 1977. A fourth step, outside the merger agreement between Horizon and Dedham, occurred on November 25, 1977. The directors of Microwave, acting under G. L. c. 156B, § 82, voted to merge into itself this new wholly owned subsidiary, which had acquired the stock of Horizon.[10] Thus, only Microwave survived.

1. *The nature of Emil's complaint.* As the trial judge read them, the claims expressed by Emil in his counterclaim related to Horizon, not Microwave. The judge ruled that "any claim of Emil of mistreatment by Microwave in diluting his shareholder's position is not in the counterclaim and not before the court at this time." We read Emil's pleading more expansively. Cf. *Charbonnier* v. *Amico*, 367 Mass. 146, 152-153 (1975); *School Comm. of Franklin* v. *Commissioner of Educ.*, 17 Mass. App. Ct. 683, 692 (1984), rev'd on other grounds, 395 Mass. 800 (1985). At bottom, Emil's grievance is that he was "cashed out" of Horizon, while his brother wound up with a larger equity in the economic unit which survived, Microwave. Emil's complaint is against the end result of the triangular merger and it does not assist analysis to focus on parts, rather than the whole of the transaction.

Moreover, Emil's counterclaim is not without shots aimed at Microwave. It complains that distributing 5,475 shares of

---

[9] Microwave had earlier prepared for this exchange by issuing 5,475 shares of its stock to Dedham.

[10] Under G. L. c. 156B, § 82 (*a*), inserted by St. 1964, c. 723, § 1, "[a] corporation owning at least ninety percent of the outstanding shares of each class of stock of another corporation . . . may merge into itself a corporation . . . the stock of which it owns by vote of its directors. . . ."

Microwave "and not to extend to Emil [the] same or similar offer was to discriminate against Emil." The counterclaim further charged that Microwave had acted in violation of G. L. c. 156B, § 78 (*c*) (2) (ii) and § 78 (*c*) (1) (iii). What Emil hoped to achieve by the latter assertions is unclear. In closing argument Emil's counsel conceded he did not wish to unravel the merger; what he wanted was parity with William in what was exchanged for his Horizon stock, viz., shares of Microwave. Procedurally, we conclude, Microwave is in the case. To the degree that the gravamen of Emil's action was abuse of fiduciary duty by a majority stockholder, he was not required to bring a minority stockholder's derivative suit against Microwave but could move against that corporation and William directly. See *Donahue* v. *Rodd Electrotype Co.,* 367 Mass. at 579 & n.4; *Wilkes* v. *Springside Nursing Home, Inc.,* 370 Mass. 842 (1976); *Leader* v. *Hycor, Inc.,* 395 Mass. 215 (1985).

2. *Technical legality of the merger.* Count III of the counterclaim alleged failure to comply with certain statutory requirements in effecting the merger and requested that the merger be set aside. Although evidence was adduced at trial bearing on the technical compliance issue, a strong case can be made that Emil's trial counsel ceased pressing for that relief in closing argument and asked only for parity in the manner of payment. In the absence of an express waiver of the point, however, we think it necessary to treat the statutory compliance question.

All the allegations of deviation from statutory requirements which Emil makes he directs at Microwave. They are these: (a) in violation of G. L. c. 156B, § 78 (*c*) (1) (ii), Microwave failed to give each stockholder of record thirty days' notice of a meeting to approve the merger agreement; (b) in violation of § 78 (*c*) (1) (iii), the merger agreement was not approved by the stockholders of Microwave; and (c) in violation of § 78 (*c*) (2) (ii), the merger agreement was not approved by the stockholders of Microwave. The fallacy in each case of asserted noncompliance is that the subject matter of § 78 concerns merger agreements and the only parties to the merger agreement were Horizon and Dedham. Microwave was not a party to a

§ 78 merger agreement. Neither the issuance of stock by Micro-wave nor the ultimate absorption by Microwave of Horizon involved § 78. The latter step, as we have noted, proceeded under § 82, a section which established independent procedures for the merger of subsidiary corporations into a parent. See *Joseph* v. *Wallace-Murray Corp.*, 354 Mass. 477, 480 (1968). A § 82 merger does not require the approval of stockholders. Any temptation to read the provisions of § 78 (*c*) into § 82 as a limiting factor on the power which § 82 confers upon directors is extinguished by observing that subsection (*c*) of § 82 pro-vides that the provisions of subsection (*e*) of § 78 "shall, so far as appropriate, apply to mergers under this section." No like cross reference appears as to subsection (*c*) of § 78. Requir-ing adherence to subsection (*e*) implies exclusion of adherence to subsection (*c*) to which § 82 does not refer. See *Harborview Residents' Comm., Inc.* v. *Quincy Housing Authy.*, 368 Mass. 425, 432 (1975). Elimination of minority stock holdings with-out a stockholder vote is an acknowledged objective of so-called short form merger statutes such as § 82. See Burgman & Cox, Reappraising the Role of the Shareholder in the Modern Public Corporation: *Weinberger's* Procedural Approach to Fairness in Freezeouts, 1984 Wis.L.Rev. 593, 600 (1984).

There is no ignoring that the triangular merger device permits an acquiring corporation to outflank the requirement of stock-holder approval which attends a straight merger under § 78. Business and income tax reasons exist, however, which make the triangle technique not merely expeditious but in the interest of all parties to a merger. Relief from expensive proxy solici-tations (not, of course, applicable to the close corporation), insulation from business risks taken by the acquired corpora-tion, and the ability to achieve a tax free reorganization under Federal income tax law are among those benefits. See Freling, Current Problems in Subsidiary Mergers and Other Triangular Reorganizations, 29 N.Y.U. Ann. Inst. on Fed. Taxn. 347 (1971); McGaffey, Buying, Selling, and Merging Businesses 103-104 (1979); Raskin, Triangular Mergers: A Useful Tech-nique, 12 Colo. Law. 1630 (1983). A certain tolerance and recognition of corporate form threads through our decisional

law. See *M. McDonough Corp.* v. *Connolly,* 313 Mass. 62, 65-66 (1943); *My Bread Baking Co.* v. *Cumberland Farms, Inc.,* 353 Mass. 614, 618 & n.6, 619-620 (1968). The limits of tolerance are exceeded if corporate form is used to inflict gross inequity, injury, or fraud. See *M. McDonough Corp.* v. *Connolly, supra* at 66; *My Bread Baking Co.* v. *Cumberland Farms, Inc., supra* at 620. *Searcy* v. *Paul,* 20 Mass. App. Ct. 134, 139 (1985). We are disinclined in this case to encumber, short of a showing of fraud, gross inequity, or injury, procedures which the statute expressly authorizes to provide desirable flexibility. See *Leader* v. *Hycor, Inc.,* 395 Mass. at 221. Compare the disposition to disregard artifice created for tax avoidance, *Gregory* v. *Helvering,* 293 U.S. 465, 469-470 (1935); *Helvering* v. *Elkhorn Coal Co.,* 95 F.2d 732, 735 (1938). Compare also *Rokowsky* v. *Gordon,* 501 F. Supp. 1114, 1117 (D. Mass. 1980), disregarding a dummy corporation.

3. *Fiduciary duty of the majority to the minority.* That which the majority may do as matter of statutory law, because the majority has the votes and the statutory scheme allows it, is nonetheless subject to the condition, particularly in a close corporation, that majority stockholders "may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." *Donahue* v. *Rodd Electrotype Co.,* 367 Mass. at 593. They may not tyrannize the minority.[11] *Wilkes* v. *Springside Nursing Home, Inc.,* 370 Mass. at 849. *Leader* v. *Hycor, Inc.,* 395 Mass. at 221.

Oppression is what Emil complains about, but it is oppression of a very limited sort. He does not appear to dispute that good

[11] A requirement of fair dealing has not been limited to the close corporation setting. In a celebrated case involving publicly held corporations and a "take out merger," i.e., the elimination of the stockholders of the acquired corporation, the Delaware Supreme Court announced an "entire fairness" rule which was to apply to the disclosures and negotiations leading to the merger as well as to the price paid to the stockholders taken out. See, *Weinberger* v. *UOP, Inc.,* 459 A.2d 701 (Del. 1983); Case Note, Delaware Improves its Treatment of Freeze Out Mergers: *Weinberger* v. *UOP, Inc.,* 25 B.C.L. Rev. 685, 712-722 (1984); Burgman & Cox, loc. cit., 1984 Wis.L. Rev. at 614-622.

business reasons existed to fold up Horizon, but objects that he received cash while William received Microwave stock. Emil's protest represents an inversion of the facts in the *Donahue* case. There the majority arranged the sale of its shares in a close corporation on favorable cash terms and left the minority holding shares for which there was a doubtful market. One readily imagines business circumstances (e.g., an earnings record, an impending buy out, or the incipient marketing of an exceptionally promising product) in which the shares of a close corporation are more valuable than their book value. For discussions of approaches to establishing the value of corporate stock, see *Piemonte* v. *New Boston Garden Corp.*, 377 Mass. 719 (1979); *Leader* v. *Hycor, Inc.,* 395 Mass. at 224; Note, Valuation of Dissenters' Stock Under Appraisal Statutes, 79 Harv.L.Rev. 1453, 1456-1468 (1966). On the record developed in the trial court, there are no indicators to the market or investment value of Horizon's stock. Indeed, the limited range of Horizon's activity made a book value approach to the value of its stock entirely apt.

In determining that the price paid Emil for his Horizon shares was fair, the trial judge could — and did — take into account that three years earlier Emil had agreed to almost identical terms for the disposition of his Horizon stock. In a sense, the 1977 triangular merger carried out the economic objective of the 1974 agreement.

There is no dispute that the book value of Microwave stock paid to William closely equalled the cash and note paid to Emil. If Emil contends that the market value of the Microwave shares issued in 1977 was higher, he failed to go beyond speculating that this was a possibility. He introduced no evidence as to what the market value of the Microwave stock was. In terms of the investment potential of the cash Emil received and was to receive, it is as likely, on the record, that his pay-out was as valuable as William's.

Adhering to the economic terms of the 1974 agreement for collapsing Horizon was not without benefit or business purpose. It appeared to be an arrangement in which Saad, the outside stockholder, acquiesced. The relationship of Emil and William

had been characterized by hostility and deadlock. There was reason to avoid establishing holdings in Microwave which would make more likely that the brothers could thwart one another in the future, to the detriment of the corporate enterprise. Microwave and William, therefore, had a legitimate business purpose for structuring the merger as they did to enable Microwave to operate effectively in the best interests of all concerned. *Leader* v. *Hycor, Inc.,* 395 Mass. at 222.

As Emil's complaint is that he did not receive a fair compensation package for his stock, it is singular that he failed to avail himself of the appraisal remedy afforded by G. L. c. 156B, §§ 86 through 98. Indeed, the last of those sections, § 98, provides that a demand for appraisal is the exclusive remedy for a stockholder who dissents from a merger, except that the stockholder may "bring or maintain an appropriate proceeding to obtain relief on the ground that [the] corporate action will be or is illegal or fraudulent as to him." G. L. c. 156B, § 98, inserted by St. 1965, c. 685, § 43. A demand for appraisal would have focused attention on the core of Emil's grievance, without the higher burden (which Emil, on his theory of the case, assumed) of proving illegal or fraudulent conduct. *Pupecki* v. *James Madison Corp.,* 376 Mass. 212, 216 (1978).

4. *Other matters.* Prior to trial the judge ruled that Emil was not entitled to a jury trial on any of the issues raised in his counterclaim and that he could not maintain a count alleged under G. L. c. 93A. Emil opted to pitch his case on the illegality of the merger and breach of fiduciary duty by William. Either claim necessarily required equitable relief. The judge's ruling that there was no jury issue was, therefore, correct. The dismissal of the c. 93A count finds support in *Riseman* v. *Orion Research, Inc.,* 394 Mass. 311, 313-314 (1985), and *Newton* v. *Moffie,* 13 Mass. App. Ct. 462, 467-470 (1982).

*Judgment affirmed.*