*680 After careful consideration of Respondents' petition for rehearing, the Court grants the petition for rehearing, dispenses with further briefing, and substitutes the attached opinion for the opinion previously filed in this matter.
/s/ Donald W. Beatty, C.J.
**218 /s/ John W. Kittredge, J.
/s/ Kaye G. Hearn, J.
/s/ John Cannon Few, J.
/s/ George C. James, Jr., J.
This case involves the South Carolina Home Builders Self Insurers Fund (Fund), which was created by the Home Builders Association of South Carolina, Inc. "for the purpose of meeting and fulfilling an employer's obligations and liabilities under the South Carolina Workers' Compensation Act." The Fund at issue here was established in September 1995 by an "Agreement and Declaration of Trust" (Agreement) between the Home Builders Association of South Carolina, Inc. (Association) and the Fund's Board of Trustees (Board). The underlying dispute arose after the Board announced plans to wind down the Fund and use the Fund's remaining assets to finance a new mutual insurance company. Petitioners, who were members of the Fund, disagreed with that decision and challenged the Board's authority to use the Fund's assets in such a way. The trial court twice dismissed Petitioners' suit, first on the basis that it involved the internal affairs of a trust and therefore should have been filed in probate court, then in a subsequent proceeding, on the basis that the lawsuit was a shareholder derivative action and that the complaint failed to comply with the pleading requirements of Rule 23(b)(1), SCRCP.
On appeal, the court of appeals affirmed the dismissal of Petitioners' complaint, finding the trial court properly concluded (1) the Fund was not a trust; (2) Petitioners' claims were derivative in nature; and (3) Petitioners' complaint was properly dismissed as it did not properly allege a pre-suit demand as required by Rule 23(b)(1). Patterson v. Witter , 418 S.C. 66, 791 S.E.2d 294 (Ct. App. 2016). We issued a writ of certiorari to review the court of appeals' decision. We reverse and remand, for Petitioners have satisfied the pleading requirements of Rule 23(b)(1), irrespective of whether the Fund is properly characterized as a trust.
**219 I.
All employers conducting business in South Carolina must secure the payment of compensation to their injured employees. S.C. Code Ann. § 42-5-10 (2015). This may be accomplished either by purchasing workers' compensation liability insurance or by qualifying as a "self-insured" employer. To become self-insured, an employer must demonstrate to the Workers' Compensation Commission (Commission) that it has the "financial ability to pay directly the compensation in the amount and manner and when due as provided" by the Act. S.C. Code Ann. § 42-5-20 (2015).
The Act also allows employers to create a self-insured workers' compensation liability fund or "pool." Id . § 42-5-20 ("The [C]omission may, under such rules and regulations as it may prescribe, permit two or more employers in businesses of a similar nature to enter into agreements to pool their liabilities under the Workers' Compensation Law for the purpose of qualifying as self-insurers."). For a self-insurance fund to be approved, an officer of the proposed organization must submit to the Commission various documents, financial statements, and notably, "[a]n indemnity agreement which jointly and severally binds each member of the fund, signed by each proposed member." S.C. Code Ann. Regs. 67-1501(E)(1)-(8) (2012).[1] A self-insured fund must be approved by the Commission *681 before it may begin operation. Id . § 67-1502 (2012).
The Agreement identified its purpose as:
meeting and fulfilling an employer's obligations and liabilities under the South Carolina Workers' Compensation Act; to form an overall self-insurers fund pursuant to Laws of the State of South Carolina, which provides for workers' compensation coverage and benefits; to provide, as appropriate, allowable advance discounts on premium payments made by employers for workers' compensation coverage; and to minimize the cost of providing workers' compensation coverage by developing and refining specialized claim services **220 and a loss prevention program within the South Carolina Home Building Industry.
(emphasis added).
In addition to establishing the authority of Board members and extensive guidelines for the administration of the Fund, the Agreement further provided that amendments to the Agreement may be made by a majority of the Board, "However, this Agreement may not be amended so as to change its purpose as set forth [above] or to permit the diversion or application of any of the funds of the [Fund ] for any purpose other than those specified herein ." (emphasis added). The Agreement also provided that "In the event of termination, the remaining funds available in the [Fund], after providing for all outstanding obligations, shall be distributed, through a formula determined by the [Board], to the participating members."
In the fall of 2003, the Board began discussing the idea of winding down the Fund and using the remaining monies on hand to capitalize a mutual insurance company, presumably to be comprised of the members of the Fund. Over the next several years, the Board continued to explore this "conversion" with the Association, the Commission, and the Department of Insurance (DOI); the two biggest challenges were identified as accumulating the $5 million necessary for the mutual insurance company's starting capital reserve and upgrading the Fund's existing computer systems to enable compliance with DOI's regulatory requirements.
In furtherance of the plan to create a mutual insurance company, the Board authorized expenditures from the Fund to purchase a custom computer software program; purchase office space costing $1.6 million; include "operations of the insurance company" in the scope of its directors and officers insurance coverage; and to subscribe to a national workers' compensation insurance-rating and data-collection bureau.
In May 2011, the Board notified the Commission it planned to cease accepting new members into the Fund effective July 1, 2011, and planned to withdraw the Fund from the self-insured program effective January 1, 2012. The Board also sought and received "approval" from the Commission to use $5 million in Fund assets to capitalize the reserve fund for the **221 mutual insurance company; however, this "approval" included no evaluation of whether this use of Fund monies complied with the terms of the Agreement. Indeed, the director of the self-insurance division of the Commission wrote to the Fund's administrator:
In response to your request[,] we have approved the release of $5 million in non-pledged assets of the SC Home Builders Self-Insurers Fund to be used solely to capitalize the SC Builders Insurance Group, Inc., in conjunction with the closure of the self-insured [F]und. It is understood that the [F]und will cease accepting new members effective July 1, 2011[,] and will become no longer self-insured for workers' compensation in South Carolina effective January 1, 2012. The outstanding liabilities of the [F ]und at the time of closure, January 1, 2012, will remain the responsibility of the self-insured [F ]und and its membership under joint and several liability . The [F]und is required to provide a final audited financial statement following closure and will continue to provide the Commission[']s Form 11, Fund Quarterly Financial Report, until further notice. The [F]und will also be required to comply with Self-Insurance Tax and Second Injury Fund Assessment requirements following the [F]und[']s closure.
(emphasis added).
Petitioners are members of the Fund who, in February 2012, filed suit against the Fund, *682 the Board, and the individual members of the Board (collectively, Respondents). Petitioners alleged breach of fiduciary duty; breach of trust; breach of contract; and breach of contract accompanied by a fraudulent act. Petitioners alleged that the Board committed ultra vires acts in breach of its fiduciary duties by removing more than $5 million from the Fund to establish the mutual insurance company-monies which should have been returned to the Fund's members under the terms of the Agreement. Petitioners also alleged that in addition to not receiving their share of the $5 million paid-in surplus, they have suffered or will individually suffer additional tax consequences and additional liability exposure to cover the Fund's obligations. Petitioners alleged that all improper expenditures should be reimbursed to the Fund to reduce the amounts for which Fund members might ultimately be jointly and severally liable. Additionally, **222 Petitioners sought an accounting and a declaration that Fund assets could not be used for the purpose of establishing a mutual insurance company.
Respondents moved to dismiss the complaint, asserting eight separate bases for dismissal, including (1) the circuit court's lack of subject matter jurisdiction because the complaint involved the internal affairs of a trust, which fell within the exclusive jurisdiction of the probate court;[2] and (2) that the action was derivative in nature and did not meet the pleading requirements of Rule 23(b)(1), SCRCP.[3] Respondents' motions sought protection from responding to Petitioners' discovery requests during the pendency of the motions; incorporated by reference an affidavit of the Fund's administrator, to which twelve separate exhibits were attached; and stated "the Court will be asked, pursuant to Rule 12(b)(6), SCRCP, to consider matters outside of the Complaint and treat the motion as one for summary judgment."
On September 4, 2012, a hearing was held on Respondents' motions to dismiss, during which the circuit court indicated it was inclined to dismiss the complaint based on the probate court's exclusive jurisdiction of the internal affairs of trusts and requested proposed orders. On January 30, 2013, after the hearing but before the circuit court issued its written order, Petitioners sent a written demand letter to Respondents' counsel itemizing specific requests:
In particular, our clients believe the following actions are necessary and should be taken on behalf of the [F]und:
**223 1. The $5,000,000 which was taken out of the [F]und as excess funds to establish a competing mutual fund should be distributed immediately to the beneficiaries of the Trust as it is not needed for the operation of the South Carolina Builders Self Insurers Fund.
2. An accounting should be made of all remaining funds in custody of the South Carolina Home Builders Self Insurers Fund. All funds not necessary to insure liability should be distributed to members of the Trust.
3. Elections have not been held as required by the Trust documents. Elections should be held for all positions of the Trustees.
4. The Trust should be dissolved as it appears in the Trustees' decision that a competing entity should be set up and that the Trust no longer serves its functions. As a result, the Trust should be dissolved with requisite amounts kept on hand to insure against future liabilities with the remaining assets distributed to members of the Trust.
*683 5. All assets contemplated for use by the Mutual Fund and purchased with that intent should be sold with the proceeds to be distributed to beneficiaries of the Trust.
The letter also stated:
[We] believe previous correspondence in the lawsuit set forth the basis for these requests of the Trust. We are just sending this to you to make clear to you that under Rule 23 of the South Carolina Rules of Civil Procedure we are asking that these actions be taken. [We] believe these requests have already been made to you as well as your clients. It is our understanding that your clients have refused to take these actions.
If your clients' position is any different, please let [us] know so we can discuss this matter. If [we] do not hear from you regarding this, [we] will assume your clients refuse to take the actions as requested above, and we will take appropriate action.
Respondents did not immediately respond.
On March 5, 2013, the circuit court issued a written order of dismissal finding "[i]t is clear from the documents submitted **224 to the Court that this dispute concerns a trust" and concluding the circuit court therefore lacked subject matter jurisdiction. Nevertheless, the dismissal was without prejudice, allowing Plaintiffs to refile their complaint in Probate Court and subsequently remove the re-filed matter back to circuit court.[4]
Still having received no response to their January 30, 2013 letter, Petitioners refiled their lawsuit in probate court on April 9, 2013, alleging the same causes of action and including a new paragraph, which stated:
8. To the extent required by South Carolina Rule of Civil Procedure 23, the Plaintiffs allege:
a. The Plaintiffs were beneficiaries of the trust at all times relevant including when the transactions complained of were made.
b. The Plaintiffs, their agents or others on their behalf have made efforts to obtain the action they desire in this matter including correspondence to counsel for the Defendants, meetings with counsel for the Defendants, correspondence to the Trust and a previous lawsuit to no avail.
The re-filed suit was removed to circuit court.
Respondents moved to dismiss this second complaint, alleging, among other things, that the lawsuit did not involve a trust but rather was a shareholder derivative action and that the complaint failed to comply with the pleading requirements of Rule 23(b)(1) and therefore should be dismissed; Respondents submitted an affidavit in support of their motion.[5]
**225 Ultimately, the circuit court dismissed Petitioners' complaint, finding the Fund was an unincorporated association, not a trust, and that the complaint was therefore subject to Rule 23(b)(1). The circuit court held that the complaint failed to comply with Rule 23(b)(1). Petitioners then filed a Rule 59(e) motion, arguing the pre-suit demand was properly made and that the trial court's order elevated form over substance. In their motion, Petitioners also sought to supplement or amend their pleadings if more detailed pleadings were required. The circuit court denied this motion.
On appeal, the court of appeals affirmed, finding the circuit court properly concluded (1) the Fund was an unincorporated association and not a trust; (2) Petitioners' claims were derivative in nature; and (3) Petitioners'
*684 complaint was properly dismissed as it did not properly allege a pre-suit demand as required by Rule 23(b)(1). Patterson v. Witter , 418 S.C. 66, 791 S.E.2d 294 (Ct. App. 2016). This Court issued a writ of certiorari to review the court of appeals' decision.
II.
"In reviewing the dismissal of an action pursuant to Rule 12(b)(6), SCRCP, the appellate court applies the same standard of review as the trial court." Doe v. Marion , 373 S.C. 390, 395, 645 S.E.2d 245, 247 (2007) (citation omitted). "In considering a motion to dismiss a complaint based on a failure to state facts sufficient to constitute a cause of action, the trial court must base its ruling solely on allegations set forth in the complaint." Id . (citation omitted). "The question is whether, in the light most favorable to the plaintiff, and with every doubt resolved in his behalf, the complaint states any valid claim for relief." Id . at 395, 645 S.E.2d at 247-48 (quoting Gentry v. Yonce , 337 S.C. 1, 5, 522 S.E.2d 137, 139 (1999) ). "The complaint should not be dismissed merely because the court doubts the plaintiff will prevail in the action." Id . at 395, 645 S.E.2d at 248 (citation omitted).
In considering a motion for dismissal under Rule 12(b)(6), if "matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Rule 12(b), SCRCP ; see also, e.g ., **226 Brown v. James , 389 S.C. 41, 47 n.5, 697 S.E.2d 604, 607 n.5 (Ct. App. 2010) (citations omitted) (finding that the trial court's consideration of matters beyond the pleadings converted the motion to dismiss into a motion for summary judgment). Because the parties submitted matters outside the pleadings that were not excluded by the court and certain factual findings in the circuit court's order exceeded the scope of the facts alleged in the complaint, we find this motion to dismiss was converted into a motion for summary judgment and we review it as such.
"[I]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact[, then] the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP. "In determining whether any triable issue of fact exists, the evidence and all inferences which can reasonably be drawn therefrom must be viewed in the light most favorable to the nonmoving party." Pye v. Estate of Fox , 369 S.C. 555, 563, 633 S.E.2d 505, 509 (2006) (citations omitted). "Summary judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law." USAA Prop. & Cas. Ins. Co. v. Clegg , 377 S.C. 643, 653, 661 S.E.2d 791, 796 (2008) (quoting Middleborough Horizontal Prop. Regime Council of Co-Owners v. Montedison S.p.A. , 320 S.C. 470, 479, 465 S.E.2d 765, 771 (Ct. App. 1995) ).
A. Unincorporated Association or Trust
The court of appeals found that although the Agreement, by its terms, purported to create a trust, the Fund possessed many characteristics typically associated with business corporations, and thus, the Fund was properly considered an unincorporated association for the purposes of the pre-suit demand and pleading requirements of Rule 23. Petitioners argue the court of appeals erred in categorizing the Fund as anything other than precisely what it purports to be-a trust-and therefore, Petitioners argue the pre-suit demand and pleading requirements of Rule 23(b)(1) are inapplicable. Petitioners alternatively assert that in any event they satisfied the pleading requirements of Rule 23(b)(1). On this latter point, we agree with Petitioners. Nevertheless, we address the dispute **227 over the proper characterization of the Agreement and its impact on the applicability of Rule 23(b)(1).
In construing a trust agreement, "a court must resort first to the language of the instrument, and if the language is perfectly plain and capable of legal construction, the language determines the form and effect of the instrument." Germann v. N.Y. Life Ins. Co. , 286 S.C. 34, 38, 331 S.E.2d 385, 388 (Ct. App. 1985) (citing Chiles v. Chiles , 270 S.C. 379, 242 S.E.2d 426 (1978) ). "If the intention of the settlor appears on the face of the *685 agreement, then the court will effectuate it, unless it is in conflict with principles of law." Id . (citing Citizens & S. Nat'l Bank of S.C. v. Auman , 259 S.C. 263, 191 S.E.2d 511 (1972) ).
Despite this black-letter law, we acknowledge the truth in the court of appeals' observation that the Fund is, in many ways, dissimilar to a garden-variety trust. Patterson , 418 S.C. at 78-80, 791 S.E.2d at 301-02. Nevertheless, that dissimilarity is not dispositive. See Navarro Sav. Ass'n v. Lee , 446 U.S. 458, 462-66, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980) (rejecting an argument that a business trust should be treated as an unincorporated association simply because it resembled a business association in several aspects, finding instead that the entity was an express trust, just as it purported to be, and that there was no basis for disregarding the trust's legal form). But many states permit (indeed, one state even requires[6] ) workers' compensation self-insured funds to be organized as trusts.[7] Also, it is common in many other states for **228 fund participants to be subject to joint and several liability.[8] **230 The presence of joint and several liability among *686 Fund members does not necessarily undermine a trust's identity as such; rather it is a function of the overriding policy concern of ensuring injured workers' claims are paid.
The Agreement resembles a trust in some respects, and it does not resemble a trust in other respects. However, the question of whether the Fund is a trust need not be resolved, for we elect to follow the precedent from other jurisdictions applying Rule 23(b)(1) to all actions which are derivative in nature, even if the entity in question is a *687 trust. See, e.g ., Accredited Aides Plus, Inc. v. Program Risk Mgmt., Inc. , 147 A.D.3d 122, 46 N.Y.S.3d 246, 255 (2017) (finding the "analysis applicable to derivative actions against corporations has been held to apply to trusts" and finding that the joint and several liability of workers' compensation group self-insured **231 trust members "does not require us to set aside the legal distinction [ ] between derivative and direct claims"); see also In re Mortg. & Realty Tr. Sec. Litig. , 787 F.Supp. 84, 86 (E.D. Pa. 1991) (applying the Rule 23 demand requirement to a derivative action against the board of trustees of a real estate investment trust). The key inquiry is whether the underlying challenge is properly characterized as derivative in nature. Accordingly, the applicability of the pre-suit demand and pleading requirements of Rule 23(b)(1) are to be determined not on the basis of whether the entity involved is or is not a trust, but rather, whether the claims at issue are direct or derivative. We turn now to that issue.
B. Direct or Derivative
Petitioners argue that the court of appeals erred in finding all of their claims were derivative in nature. Specifically, Petitioners allege that based on the joint and several liability the Act imposes upon members of the Fund, "the injury is to each beneficiary who must, individually, make up for any shortfall in trust assets." Based on this individual liability exposure, Petitioners argue their actions are direct rather than derivative. We agree in part and disagree in part, and we find Petitioners' complaint includes both direct and derivative claims.
"An action seeking to remedy a loss to the corporation is generally a derivative one." Brown v. Stewart , 348 S.C. 33, 49, 557 S.E.2d 676, 684 (Ct. App. 2001) (citation omitted). An action regarding the fiduciary obligation of a director is ordinarily enforceable through a derivative action. Id . (citation omitted). "A shareholder may maintain an individual action only if his loss is separate and distinct from that of the corporation." Id . (citation omitted).
"If misconduct by the management of a corporation has caused a particular loss to an individual stockholder, the liability for the mismanagement is an asset of the individual stockholder." Id. (quoting Ward v. Griffin , 295 S.C. 219, 221, 367 S.E.2d 703, 703-04 (Ct. App. 1988) ). "Of course, a suit based on the misconduct can be brought by the individual stockholder." Id . at 49, 557 S.E.2d at 684-85 (quoting Ward , 295 S.C at 221, 367 S.E.2d at 703-04 ). "It becomes material, **232 therefore, to inquire whether the acts of mismanagement charged to the directors affected the plaintiffs directly , or as their interests were submerged in the corporation whose assets were thus dissipated." Id . at 49, 557 S.E.2d at 685 (quoting Stewart v. Ficken , 151 S.C. 424, 427, 149 S.E. 164, 165 (1929) ).
"Specifically, to distinguish a derivative claim from a direct one, the court considers: (1) who suffered the alleged harm, the corporation or the suing stockholders, individually, and (2) who would receive the benefit of any recovery or other remedy, the corporation or the stockholders individually." 19 Am. Jur. 2d Corporations § 1923 (2015). Direct and derivative claims may be brought simultaneously. 19 Am. Jur. 2d Corporations § 1922 (2015). "When determining whether a claim is derivative or direct, some injuries affect both the corporation and the stockholders; if this dual aspect is present, a plaintiff can choose to sue individually." Id . (citing Carsanaro v. Bloodhound Techs., Inc ., 65 A.3d 618 (Del. Ch. 2013) ); see also Horizon House-Microwave, Inc. v. Bazzy , 21 Mass.App.Ct. 190, 486 N.E.2d 70, 74 (1985) (observing a shareholder may pursue both direct and derivative claims in a single action).
In evaluating Petitioners' claims in the underlying complaint, the court of appeals found:
In the instant case, [Petitioners] allege the Board's decision to remove $5 million from the Fund harmed the Fund's ability to adequately cover its risks. Thus, the action is premised on the alleged harm to the overall Fund, not to individual members. Accordingly, we find the circuit court correctly held [Petitioners'] claims were derivative and subject to the pleading requirements of Rule 23(b)(1).
*688 Patterson , 418 S.C. at 81, 791 S.E.2d at 302 (citations omitted).
While we agree with the court of appeals that Petitioners' claim that the removal of the $5 million impacted the Fund's ability to cover its risk is derivative in nature, this claim is by no means the only claim asserted in the complaint. Indeed, the court of appeals overlooked various other causes of action and forms of relief requested in the complaint.
Though discovery has not been conducted, one or more of Petitioners' additional claims may be direct in nature. We thus find the court of appeals erred in concluding that the complaint **233 alleged only derivative claims. See Accredited Aides Plus , 46 N.Y.S.3d at 255 (finding certain claims by members of a workers' compensation group self-insured trust were direct, not derivative, in nature and observing that "just as the trust's deficits are eventually passed through to employer members as assessments by the Board, any recovery by the Board upon its claims on behalf of the trust will benefit the employer members by reducing the trust's deficit and the employer members' corresponding liabilities"). To the extent the court of appeals affirmed the dismissal of Petitioners' direct claims based on Rule 23, this was error.
Although we believe Petitioners' complaint may involve some direct claims, we nevertheless believe the court of appeals correctly found that certain claims were derivative in nature. Accordingly we turn now to what we view as the critical question before the Court-whether Petitioners' complaint met the pleading requirements of Rule 23 (b)(1).
C. Compliance with Rule 23(b)(1)
Lastly, Petitioners argue that even assuming Rule 23(b)(1) applies to their claims, the court of appeals erred in finding the requirements of that rule were not satisfied. We agree, for even if all claims are derivative and Rule 23(b)(1) applies, the demand and pleading requirements of Rule 23(b)(1) have been met.
Both the trial court and the court of appeals found evaluation of whether Petitioners' complaint complied with Rule 23(b)(1) was governed by the court of appeals decision in Carolina First Corp. v. Whittle , 343 S.C. 176, 539 S.E.2d 402 (Ct. App. 2000). In Whittle , three shareholders of Carolina First Corporation brought a derivative action seeking to recover disproportionate stock bonuses paid to three executives. Id . at 180, 539 S.E.2d at 405. The complaint included general allegations that the plaintiffs made pre-suit demands upon the Board of Directors; however, the complaint stated "merely that the plaintiffs demanded 'certain information' and 'certain actions.' " Id . at 189, 539 S.E.2d at 409. The court of appeals concluded these allegations were not sufficiently particularized to satisfy the requirements of Rule 23(b)(1), holding "[a]t a minimum, a demand must identify the alleged wrongdoers, describe the factual basis of the wrongful acts and the harm **234 caused to the corporation, and request remedial relief." Id . (citation omitted). The court of appeals noted that although the plaintiffs submitted copies of letters purporting to meet the pre-suit demand requirement, the letters could not be considered because they were not attached to the complaint; and in any event, the letters did not satisfy the pleading requirements of Rule 23(b)(1). Id. at 189-90, 539 S.E.2d at 410. Therefore, the court of appeals concluded the trial court did not err in refusing to consider them. Id . at 190, 539 S.E.2d at 410.
The facts of this case are distinguishable from those in Whittle . Here, although the January 30, 2013 pre-suit demand letter was not expressly incorporated by reference into the complaint, unlike in Whittle , the January 30, 2013 letter does constitute an adequate demand in this case. Another issue here is Petitioners' failure to include the magic phrase "which is incorporated herein by reference" in their discussion of the letter in paragraph 8 of their complaint. Indeed, the allegations concerning the pre-suit demand in Petitioners' complaint are appreciably more detailed than those in Whittle . And certainly, when the January 30, 2013 letter is considered in conjunction with the complaint, there is ample evidence that Rule 23 is satisfied.[9] The trial court simply found *689 it was **235 precluded from looking at the January 30, 2013 letter, which was error.
Moreover, in light of the parties' submissions and the trial court's willingness to consider multiple affidavits and documents outside the four corners of the complaint, we reject an approach that approves of a trial court's consideration of everything except the pre-suit demand letter that was actually sent and received. See L-7 Designs, Inc. v. Old Navy, LLC , 647 F.3d 419, 422 (2d Cir. 2011) (explaining a complaint may be "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint" (quoting Sira v. Morton , 380 F.3d 57, 67 (2d Cir. 2004) ) ); Chambers v. Time Warner, Inc. , 282 F.3d 147, 155 (2d Cir. 2002) (explaining that "when a district court considers certain extra-pleading materials and excludes others, it risks depriving the parties of a fair adjudication of the claims by examining an incomplete record"). Accordingly, we reverse the dismissal of Petitioners' complaint on the basis that it failed to comply with Rule 23(b)(1), SCRCP.
III.
For the foregoing reasons, we reverse the decision of the court of appeals and remand this case for further proceedings.
REVERSED AND REMANDED.
BEATTY, C.J., HEARN, FEW and JAMES, JJ., concur.

This requirement of joint and several liability for fund membership is not unique to South Carolina. See infra note 8.

See S.C. Code Ann. § 62-7-201(a) (Supp. 2017) (providing "the probate court has exclusive jurisdiction of proceedings initiated by interested parties concerning the internal affairs of trusts").

Rule 23(b)(1) provides:
In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains .... The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and ... the reasons for his failure to obtain the action or for not making the effort.

See S.C. Code Ann. § 62-1-302(d)(4) ("Notwithstanding the exclusive jurisdiction of the probate court over the foregoing matters, any action or proceeding filed in the probate court and relating to the following subject matters, on motion of a party, or by the court on its own motion, made not later than ten days following the date on which all responsive pleadings must be filed, must be removed to the circuit court and in these cases the circuit court shall proceed upon the matter de novo: ... (4) matters involving the internal or external affairs of trusts ....").

Respondents also alleged Petitioners lacked standing; that the contract claims failed because Petitioners were not parties to the Agreement; and that the complaint failed to meet the heightened pleading standard of Rule 9(b), SCRCP, as to the breach of contract accompanied by a fraudulent act claim.

See 77 Pa. Stat. and Cons. Stat. Ann. § 1036.2(b)(8) (West 2018) (allowing a group of employers to create a workers' compensation self-insured fund if the group "[e]xecutes a trust agreement under which each member agrees to jointly and severally assume and discharge the liabilities arising under this act").

See, e.g ., Ariz. Rev. Stat. Ann. § 23-961.01(A) (2018) ("Two or more employers, each of whom are engaged in similar industries, may enter into contracts to establish a workers' compensation pool to provide for the payment and administration of workers' compensation claims ... [b]y the execution of a trust agreement ...."); Ala. Admin. Code r. 480-5-3-.08(9) (2018) ("Each Fund shall have a set of Bylaws or shall enter into a trust agreement which shall govern the operation of the Fund."); 099-00-1 Ark. Code R. § 099.05(III)(A) (requiring a workers compensation self-insured group "to be administered under the direction of an elected board of trustees"); Ill. Admin. Code tit. 50, § 575.110 (2018) (defining the governing body of a workers' compensation self-insured fund as "any member of the pool's Board of Trustees, if the pool is a trust, or any member of the pool's Board of Directors, if the pool is any other type of entity"); 211 Mass. Code Regs. 67.06(2)(b)(2) (2018) (requiring self-insured group applicants to submit " a copy of the articles of association, trust agreement, or articles of organization"); Mich. Admin. Code r. 408.43d (2018) (requiring workers' compensation self-insured funds "to be administered under the direction of an elected board of trustees and to provide workers' compensation coverage for a group of private employers in the same industry or for public employers of the same type of unit"); Mo. Code Regs. Ann. tit. 8, § 50-3.010(1)(A)(13) (2018) (defining a workers compensation self-insured trust as "[a] combination of persons, businesses, firms, or corporations bound together to secure, jointly and severally, workers' compensation liability by holding the individual interests of each subservient to a common authority for the common interests of all. This shall also include the written instrument that creates the trust."); Tenn. Comp. R. & Regs. 0780-01-54-.04(2)(a)(1) (2018) (requiring workers' compensation self-insured fund applicants to submit "[t]he articles of incorporation, trust agreement, or any other similar document from which the pool is formed").

See Ga. Code Ann. § 34-9-151(9) (2018) (requiring workers' compensation self-insured fund agreements to include a provision "through which each member agrees to assume and discharge, jointly and severally, any and all liability under this article relating to or arising out of the operations of the fund"); Tex. Lab. Code Ann. § 407A.056(a) (requiring applicants for a certificate of approval to operate a workers' compensation self-insured fund to submit an indemnity agreement that "jointly and severally bind[s] the group and each employer who is a member of the group to meet the workers' compensation obligations of each member"); Ala. Admin. Code r. 480-5-3-.08(6) (2018) ("All participants shall sign Participation Agreements providing for joint and several liability for claims against the Fund during the coverage periods of their participation."); 099-00-1 Ark. Code R. § 099.05(III)(A)(1)(a) (2018) (requiring all fund participants to execute "[a]n indemnity agreement jointly and severally binding the group and each member thereof to comply with the provisions of the Arkansas Workers' Compensation laws and Rules and Regulations of the Commission"); Cal. Code Regs. tit. 8, § 15479(a)-(b)(1) (2018) (requiring each member of a group self-insurer to execute an "agreement under which each member of a group self-insurer agrees to assume and discharge, jointly and severally, any compensation liability under Labor Code Section 3700-3705 of any and all other employers that are parties to the group self-insurer indemnity agreement"); Colo. Code Regs. § 702-2:2-2-2(7) (2018) (requiring pool agreements to "jointly and severally bind each member to pay claims and comply with all provisions of the workers' compensation laws of the State of Colorado"); Fla. Admin. Code Ann. r. 69O-190.068(1) (2018) ("Each self-insurers fund member shall enter into an indemnity agreement jointly and severally binding the self-insurers fund and each member thereof to comply with the provisions of the Florida Workers' Compensation Law"); La. Admin. Code tit. 37, § 1111(A) (2018) ("Each self-insurance fund member shall enter into an indemnity agreement jointly and severally binding the self-insurance fund and each member thereof to comply with the provisions of the applicable Louisiana Revised Statutes and rules, regulations, and directives of the Department of Insurance."); 02-031-250 Me. Code R. § III(B)(2)(d) (2018) (requiring members of workers' compensation group self-insured plans to submit an executed indemnity agreement); Md. Code Regs. 31.08.09.08(C)(13) (2018) (requiring a workers compensation self-insured fund to submit "[c]opies of executed agreements with each member assuming joint and several liability for obligations of the group in the event of insolvency of the Self-Insurers' Guaranty Fund"); 211 Mass. Code Regs. 67.06(2)(b)(17) (2018) (requiring that all members of a workers' compensation self-insured group are jointly and severally liable for all workers' compensation obligations); Mich. Admin. Code r. 408.43g(5)(j) (2018) (requiring workers' compensation group self-insured fund records to include "[i]ndividual membership applications containing signed indemnity agreements"); Minn. r. 2780.2800(3) (2018) (providing a workers' compensation self-insured group "shall not accept any liability for a new member until a signed indemnity agreement in the form set forth in part 2780.9920 has been completed by that new member and filed with the commissioner"); 20-1 Miss. Code R. § 1.7(B)(2)(b)(8) (conditioning approval of a workers compensation self-insured fund upon the workers compensation commission's receipt of "[a]n indemnity agreement jointly and severally binding the group self-insurer and each member thereof to meet the workers' compensation obligations of each member"); Mo. Code Regs. Ann. tit. 8, § 50-3.010(5)(A)(1) (2018) (requiring that workers' compensation self-insured trusts include in the trust agreement "an indemnity clause which jointly and severally binds the group and each member thereof for payment of benefits to employees of members of the group and all other liability pursuant to Chapter 287, RSMo"); Mont. Admin. R. 24.29.621(1)(c)(i) (2018) (requiring members of a workers compensation self-insured group to execute an "agreement to accept joint and several liability for all workers' compensation benefits and occupational disease obligations incurred by the employer group"); N.J. Admin. Code § 11:15-1.3(b)(5) (2018) (requiring workers' compensation self-insured groups to obtain "[a]n indemnity and trust agreement, in a form satisfactory to the Commissioner, jointly and severally binding the group and each member thereof to meet the workers' compensation obligations of each member, and establishing a trust for the benefit of persons qualifying to receive workers' compensation awards or payments from employers participating in the group"); N.Y. Comp. Codes R. & Regs. tit. 12, § 317.9(b)(7) (2018) (allowing a group self-insurer "to immediately levy an assessment upon the group members or take such other action as may be appropriate in order to make up the deficiency"); Okla. Admin. Code 810:25-11-15(a)(1) (2018) (requiring "[e]very member of a group self-insurance association shall execute an indemnity agreement ... under which each member agrees to assume and discharge, jointly and severally, liability under the AWCA of any and all employers party to such agreement"); Or. Admin. R. 436-050-0270(1)(g) (2018) (requiring employers applying for certification as a self-insured employer group to submit a "'Group Self-Insured Indemnity Agreement' or another form authorized by the director, that jointly and severally binds each member for the payment of any compensation and moneys due to the director by the group or any member of the group"); 34 Pa. Code § 125.133(c)(8)(i) (2018) (requiring workers' compensation group self-insured applicants to submit to the workers compensation bureau the group's "proposed trust agreement and bylaws, which shall include: (i) A pledge that each member will be jointly and severally liable for the expenses and other obligations of the fund and for each other member's workers' compensation liability which is incurred while it is a member, including liability for assessments on claims incurred during a member's membership but not issued until after it has terminated membership"); Tenn. Comp. R. & Regs. 0780-01-54-.04(2)(e)(2) (2018) (requiring workers' compensation self-insured pool applicants to submit for approval "[i]ndemnity agreements between the pool and each member establishing each member's joint and several liability to the pool for all expenses, liabilities, and claims asserted against the pool by any person or entity"); 14 Va. Admin. Code § 5-370-40(A)(1) (2018) (providing "[a]n application submitted by a group self-insurance association shall be accompanied by the following items ... 1. A copy of the members' indemnity agreement and power of attorney required by 14 VAC 5-370-120 binding the association and each member of the association, jointly and severally, to comply with the provisions of the Act and copies of any other governing instruments of the proposed group self-insurance association"); Wash. Admin. Code § 296-15-024(3)(a)(v) (2018) (requiring members of a workers' compensation group self-insurance fund to submit "[a]n indemnity agreement jointly and severally binding the group and each member to comply with the provisions of Title 51 RCW").

We reject Respondents' contention that such a finding eviscerates Rule 23(b)(1) and the business judgment rule. Petitioners' primary allegation is that the trustees failed to adhere to the absolute terms of a written contract-the Agreement-which provides: (1) "[T]his Agreement may not be amended so as to change its purpose as set forth [above] or to permit the diversion of application of any of the funds of the [Fund ] for any purpose other than those specified herein "; and (2) "In the event of termination, the remaining funds available in the [Fund ], after providing for all outstanding obligations, shall be distributed , through a formula determined by the [Board], to the participating members ." (emphasis added); cf. Fisher v. Shipyard Vill. Council of Co-Owners, Inc. , 415 S.C. 256, 271, 781 S.E.2d 903, 911 (2016) ("A corporation may exercise only those powers granted to it by law, its charter or articles of incorporation, and any bylaws made pursuant thereto."). As a result, the gravamen of Petitioners' complaint is that the Fund failed to honor the non-discretionary terms of a written contract with its members, not that the trustees failed to exercise good faith, prudent judgment in the best interest of the corporate entity. While the latter might have implicated the business judgment rule, the former certainly does not. Our opinion today should in no way be read to denigrate the important role the business judgment rule plays in limiting post hoc secondguessing of the decisionmaking and conduct of corporate managers.