# THE STATE OF SOUTH CAROLINA
## In the Supreme Court

Brad J. Walbeck and Lea Ann Adkins, Both Individually and Derivatively on Behalf of The I'On Assembly, Inc.; I'On Assembly, Inc., Petitioners-Respondents,

v.

The I'On Company, LLC; The I'On Club, LLC; The I'On Group, LLC f/k/a Civitas, LLC; and I'On Realty, LLC, Respondents-Petitioners.

Appellate Case No. 2019-000968

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Charleston County
The Honorable Stephanie P. McDonald,
Circuit Court Judge

---

Opinion No. 28134
Heard December 14, 2022 – Filed February 8, 2023

---

## AFFIRMED IN PART, REVERSED IN PART

---

Justin O'Toole Lucey, Joshua Fletcher Evans, and Dabny Lynn, all of Justin O'Toole Lucey, P.A., of Mt. Pleasant, for Petitioners-Respondents.

Brian Duffy, Julie Lauren Moore, and Patrick Coleman Wooten, all of Duffy & Young, L.L.C., of Charleston, for Respondents-Petitioners.

**JUSTICE HEARN:** This case involves promises made and broken to homeowners by a developer and its affiliated entities. Following a lengthy trial, a jury returned verdicts on several causes of action in favor of the homeowners, and the developer appealed. The court of appeals initially upheld the jury's verdict for $1.75 million on the homeowners' breach of fiduciary claim and a verdict for $10,000 on a breach of contract claim by an individual homeowner. Thereafter, upon petitions for rehearing, the court of appeals completely reversed course, dismissing all of the homeowners' claims as a matter of law and reversing and remanding the breach of contract claim by the individual homeowner. We granted certiorari and now affirm in part and reverse in part, thus reinstating the jury's verdicts.

## FACTS/PROCEDURAL HISTORY

The facts of this case are complicated, and, in the words of Justice George C. James, are "not for the weary." *Stoneledge at Lake Keowee Owners' Ass'n, Inc. v. IMK Dev. Co., LLC*, 435 S.C. 109, 114, 866 S.E.2d 542, 545 (2021). I'On is a high-density residential development that comprises public squares, restaurants, shops, and homes designed to imitate historic urban housing, including a replica of downtown Charleston's Rainbow Row. After this Court rejected a referendum effort to restrict multi-use zoning, construction of I'On Phase II began around 2000. *See I'On, LLC v. Town of Mount Pleasant*, 338 S.C. 406, 409, 526 S.E.2d 716, 717 (2000).

In 2010, Plaintiffs, Brad Walbeck and Lea Ann Adkins (collectively, "Homeowners"), sued the I'On Company, LLC, the I'On Club, LLC, the I'On Group, LLC, Thomas Graham, and Vince Graham, (collectively "Developers") for various causes of action related to the nonconveyance of certain real property and community amenities within the neighborhood. Thomas Graham, Vince Graham, and I'On Realty Company, LLC were dismissed from the case prior to trial, and a mistrial was ordered during the first trial in order to realign the HOA as a plaintiff. In the subsequent trial, the jury returned verdicts in favor of Walbeck and the HOA. The HOA elected its $1.75 million verdict for breach of fiduciary duty, and Walbeck elected his $20,000 negligent misrepresentation verdict.

At the heart of Homeowners' claims is the allegation that Developers breached their promise to convey certain real property community amenities, upon their completion, to the HOA. Specifically, Homeowners claim that Developers promised to convey an event facility (the Creek Club), a community dock, a boat ramp, and a

parking lot. With the exception of a portion of the parking lot, all of these amenities are located on Lot CV-6, a civic-use zoned property along Hobcaw Creek.

In 1998, in order to comply with the Interstate Land Sales Full Disclosure Act ("ILSA"), Developers filed a Property Report with the U.S. Department of Housing and Urban Development which included the following language:

> THE RECREATIONAL FACILITIES LISTED IN THE CHART ABOVE SHALL, UPON COMPLETION OF CONSTRUCTION, BE CONVEYED TO THE [HOA] BY QUITCLAIM DEED FREE AND CLEAR OF ALL MONETARY LIENS AND ENCUMBRANCES AT NO COST TO THE [HOA] OR ITS MEMBERS. UPON CONVEYANCE OF THESE FACILITIES TO THE [HOA], IT SHALL ASSUME FULL RESPONSIBILITY FOR THE COSTS OF OWNERSHIP, OPERATION, AND MAINTENANCE OF THE FACILITIES CONVEYED TO IT.

The chart that preceded this section of the 1998 Property Report[1] included nonspecific references to a "Community Dock" and a "Creekside Park." Lot CV-6 was not listed or specifically referred to by the 1998 Property Report. Thomas Graham, one of two primary developers of I'On along with his son, testified this was because Developers did not own the lot at that time. Additionally, the I'On Company submitted plans, applications, and letters to DHEC representing that the community docks were in lieu of private docks and were "for the use and enjoyment of the I'On community." DHEC, as well as the Army Corps of Engineers, subsequently approved these plans.

When Walbeck purchased his lot in November 1999, he received a copy of the 1998 Property Report and the relevant sections were included in his lot's purchase agreement. Development of I'On continued in the early 2000s, with multiple community docks, parks, and homes. On Lot CV-6, the Creek Club and

---

[1] The 1998 Property Report also warned prospective buyers that "VARIOUS RECREATIONAL FACILITIES IN THE SUBDIVISION MAY BE OWNED AND OPERATED BY PERSONS OTHER THAN THE [HOA]. THERE IS NO GUARANTEE THAT ANY SUCH FACILITIES WILL BE AVAILABLE FOR USE BY LOT OWNERS." (all caps in original).

adjacent docks were completed in 2001.[2] Perpendicular to that lot sat Creekside Park (later named "Marshwalk Park" to avoid confusion with a nearby neighborhood). The Community Dock is distinct from the other docks built in the neighborhood during this time due to its size, deep-water access to Hobcaw Creek, and its proximity to the Creek Club.

Shortly after the 1998 Property Report was drafted, Developers began a pattern of conduct altering their initial promise to convey ownership of the disputed properties to the HOA. Beginning in December of 1998, the I'On Company sent a letter to a neighboring development, Olde Park, offering to allow residents of that neighborhood access to the community dock and boat ramp for a fee of $350,000, which was accepted. In this same letter, the I'On Company stated the community dock and boat ramp would "belong to the [HOA,]" with negligible fees to be charged for dock keys. However, at trial Vince Graham acknowledged that the plan to deed the disputed amenities to the I'On Club rather than to the HOA changed sometime between November 1998 and March 1999.

In February of 2000, the I'On Club, I'On Company, and the HOA executed a "Recreational Easement and Agreement to Share Costs." This easement granted the HOA access to the Creek Club, boat ramp, parking lot, and boat slip on Lot CV-6. Notably, when the *I'On Club* conveyed the easement to the HOA, it lacked title to the servient estate, Lot CV-6, which instead was owned by the *I'On Company*. It was not until August of 2000 that the Club acquired title, despite the fact that the amenities belonged to the HOA according to the 1998 Property Report. Developers nonetheless recorded the easement in I'On's declaration of covenants, conditions and restrictions ("I'On's Covenants"). The easement apportioned certain costs to the HOA for a term of 30 years. The HOA began making these annual payments for usage and upkeep in 2004.[3]

---

[2] Over the years, Developers have equivocated on whether the dock off Lot CV-6 is the "Community Dock" referenced in the 1998 Property Report. Even at trial, Thomas Graham vacillated, initially refusing to concede that the reference to a community dock in the report referred to the main dock at the Creek Club. When Homeowners' counsel reminded him that he had testified to the contrary in his deposition, Graham replied: "I don't remember what I said two years ago." Ultimately, after being impeached with his deposition testimony, Graham admitted that the dock at the Creek Club was intended to be conveyed to the HOA.

[3] Around that time, the HOA's board, then chaired by Developers, authorized one board member, Edward Clem, to speak to a real estate attorney about the easement.

In April of 2000, the I'On Company amended the 1998 Property Report, deleting the obligation to convey a "Creekside Park" and "Community Dock" to the HOA. Later in 2000, the I'On Company conveyed two docks and a 2.86-acre tract of land, which would become Marshwalk Park, to the HOA and again amended the property report.

This vacillation continued when, in 2005, Developers entered into a "Handover Agreement" with the HOA, which stated that "the I'On Company will notify the [HOA] Board when common area property and structures are ready to be handed over to the [HOA]." This document further outlined the importance of handing all properties over in good repair and provided assurances to the HOA that the process was prepared to go forward. Nevertheless, in an email discussing the Creek Club Boat Ramp and docks, Chad Besenfelder, Developers' manager, proposed a different plan to the Grahams in November of 2006, stating "[b]oth the HOA and the Club do not want responsibility for this area …. I think the area should stay in control of the Club so not to interfere with events."

Ultimately, Developers began to negotiate an outright sale of the two lots containing the amenities to a third party rather than convey them to the HOA. In 2007, Developers discussed several proposals concerning the Creek Club and the associated community dock and boat ramp. One of the proposals by Thomas Graham was to sell the HOA another lot for a community center at a cost of $650,000 rather than to convey the Creek Club to them. This would allow Developers to sell the Creek Club as a personal residence, providing there were not any zoning issues. However, Besenfelder tabled any plan for the time being, writing, "The docks are too controversial and taking away even part of this community amenity would cause trouble."

In 2008, Mike Russo proposed to Developers that his company, 148 Civitas, purchase Lots CV-5 and CV-6. However, Besenfelder emailed Russo in August of 2008 and acknowledged the HOA's right to the property in dispute, stating: "Subject to HOA approval, the I'On Company plans to convey the docks and boat ramp to the HOA, retaining continued easement for both I'On Club and Creek Club events."

Clem had concerns that "it was signed by the same person in three different roles, as the manager of the I'On Club; as the president of the I'On homeowners association; and as the general manager of the I'On Company. Sort of shaking hands with yourself, as I could describe it." The attorney drafted a new agreement, but the HOA Board was not satisfied with the changes and did not adopt it.

Hearing rumors about this possible sale, the HOA scheduled an October 2008 meeting to discuss Russo's attempts to purchase the lots. Following this meeting, Besenfelder emailed the Grahams requesting assurance that an upcoming meeting with the Town of Mount Pleasant would lead to the continued designation of the lots as civic property. Besenfelder proposed that Developers "not separate the docks from the Creek Club at this time." He added that it was clear, based on the current use, that the lots were properly zoned as civic property and something could be worked out with Russo to ensure the HOA's continued use of the lots because Russo "want[ed] this deal to work[.]"

Notwithstanding this attempt to sell the property to Russo, in March of 2009, Besenfelder sent another email to Developers, now confirming that he was working with Thomas Graham to help prepare the "parcel for HOA dock and ramp turnover" by dividing these amenities from the Creek Club, thus contradicting his earlier recommendations. Also in March of 2009, Russo withdrew his offer to purchase the land due to pending litigation with I'On resident Catherine Templeton.[4]

After this initial sale to Russo fell through, Developers' plan for the Creek Club Dock and Boat Ramp changed again. Besenfelder emailed the I'On Club's property manager, copying all Board members, that the I'On Company "is preparing to deed the community dock to the [HOA] and discussed plans to subdivide the property to facilitate the transaction. Even Vince Graham conceded at trial that it was "entirely reasonable for the Assembly and the homeowners to rely on this representation." Yet within hours of the Besenfelder email being sent, secret negotiations resumed between Developers and Russo for the sale of the property.

Russo again made an offer to Developers, which they accepted in June of 2009. A month later, the President of the HOA, Bruce Kinney, called Thomas Graham to discuss a phone call Kinney had received about a pending sale of the amenities, but Graham informed Kinney that the Creek Club was merely undergoing a "management change." This conversation occurred during the same time that

---

[4] Though not a party to this litigation, Templeton was a homeowner at the time of Russo's offer and had sought legal action to halt the sale of the disputed lots and amenities. Templeton attended HOA meetings, wrote the HOA board president, and generally alleged that the HOA had ownership of the disputed properties pursuant to the 1998 Property Report. She formed an LLC with other homeowners, communicated with the Board of Zoning Appeals and the Town of Mount Pleasant, but eventually settled with Thomas Graham after he threatened a countersuit.

Kinney was in the midst of negotiations with Developers to correct the recreational easement and make it permanent, and Kinney knew nothing about the sale to Russo's company, 148 Civitas, until he was informed by Thomas Graham on August 11, 2009, that the sale had taken place on August 5, 2009.

Walbeck filed suit in December of 2010, and Adkins subsequently joined. With the parties unable to resolve their disputes, the case proceeded to trial. Following a mistrial, which was granted in order to realign the HOA as a plaintiff, a second trial ensued, and the jury awarded the following damages: breach of contract ($1,000,000 for the HOA and $10,000 for Walbeck), negligent misrepresentation ($1,000,000 for the HOA and $20,000 for Walbeck), breach of fiduciary duty ($1,750,000 for the HOA), and ILSA ($1 for Walbeck).[5, 6] Having to elect their remedies, Walbeck chose his negligent misrepresentation verdict, and the HOA elected its breach of fiduciary duty claim.

The parties appealed to the court of appeals, which initially unanimously upheld the jury's breach of fiduciary duty verdict, concluded Homeowners' derivative action on behalf of the HOA could proceed because a formal demand would have been futile, and affirmed the trial court's decision to amalgamate Developers. Thus, under the first opinion, the HOA's $1,750,000 verdict and Walbeck's $10,000 breach of contract verdict were upheld. Following both parties' petitions for rehearing, the court of appeals reversed course and unanimously substituted its opinion, this time practically nullifying the jury's verdicts. *See Walbeck v. I'On Co., LLC*, 426 S.C. 494, 827 S.E.2d 348 (Ct. App. 2019). The court reversed the trial court's denial of Developers' JNOV motions on derivative claims and breach of fiduciary duty—meaning that the HOA could not collect on any of the verdicts—and reversed the trial court's finding that Developers were amalgamated. As to the only remaining claim—Walbeck's individual breach of contract cause of action—the court of appeals remanded that $10,000 verdict for a new trial because it was tainted by an erroneous amalgamation ruling. The court then affirmed the trial court's rulings that the recreational easement was invalid and that Developers were

---

[5] Walbeck and Adkins entered a settlement agreement with Russo prior to trial.

[6] The jury found for Developers on all of Adkins's claims, on the HOA's and Walbeck's fraud claims, and on Walbeck's claim for a violation of the South Carolina Unfair Trade Practices Act. Although the jury determined Developers' conduct was reckless, willful, and/or wanton, it declined to award punitive damages.

not entitled to attorney's fees. This Court granted the parties' cross-petitions for certiorari.

## ISSUES

I.   Were Homeowners' claims barred by the statute of limitations?

II.  Did the court of appeals err in its ruling regarding Homeowners' claims for breach of fiduciary duty?

III. Did the court of appeals err in finding the homeowners failed to meet the requirements for filing a derivative suit?

IV.  Did the court of appeals err in reversing the circuit court's amalgamation finding?

## DISCUSSION

Because the myriad of evidence adduced during this lengthy trial presented quintessential jury issues, we disagree with the court of appeals' reversal of the jury verdicts. We find the trial court properly submitted Homeowners' claims and the issue of the statute of limitations to the jury, and we find its verdict was supported by the evidence. *See Burns v. Universal Health Serv., Inc.*, 361 S.C. 221, 232, 603 S.E.2d 605, 611 (Ct. App. 2004) ("The verdict will be upheld if there is any evidence to sustain the factual findings implicit in the jury's verdict.") (citation omitted).

### *I.   Timeliness*

Both the individual Homeowners and the HOA filed four claims and each is subject to an applicable statute of limitations. Based on the conflicting evidence presented as to when Homeowners should have discovered that the property was not going to be conveyed to them as promised, together with the repeated assurances that it would be conveyed, the trial court submitted the issue of the statute of limitations to the jury. Developers have consistently argued this was error, and, in its second, substituted opinion, the court of appeals agreed, holding that a budgetary provision in a 2005 usage agreement triggered *as a matter of law* the running of the

limitations period for all the claims except Walbeck's individual breach of contract claim. This was error.[7]

Ordinarily, the question of when a statute of limitations began to run is one left to the jury. *Dunbar v. Carlson*, 341 S.C. 261, 269, 533 S.E.2d 913, 917 (Ct. App. 2000) ("[G]enerally, statute of limitations issues are for the jury, rather than the court, to resolve."). Specifically, the question of when a plaintiff discovered, or should have discovered the alleged harm is for the jury to decide because it is an objective question. *Arant v. Kressler*, 327 S.C. 225, 229, 489 S.E.2d 206, 208 (1997) (stating in a medical malpractice action that when there is conflicting testimony regarding time of discovery of facts giving notice, the date on which discovery should have been made becomes an issue for the jury to decide). The presence of conflicting testimony regarding the time discovery should have occurred necessarily requires the jury's resolution. *Brown v. Finger*, 240 S.C. 102, 113, 124 S.E.2d 781, 786 (1962) ("The burden of establishing the bar of the statute of limitations rests upon the one interposing it…and where the testimony is conflicting upon the question, it becomes an issue for the jury to decide.") (internal citations omitted). In the case at bar, the jury was presented with a host of conflicting evidence as to when Homeowners should have, by the exercise of reasonable diligence, discovered the facts giving rise to their claims.

The jury found the operative notice date for each claim was August 5, 2009—the date Developers conveyed the properties at issue to Russo.[8] While the jury certainly could have accepted the 2005 date argued by Developers and ultimately embraced by the court of appeals, we believe the jury's contrary finding is supported by the evidence.

---

[7] We do not address the timeliness of Walbeck's breach of contract claim because Developers now concede that Walbeck's contract to purchase his lot was a sealed instrument and thus has a twenty-year statute of limitations. *See* S.C. Code Ann. § 15-3-520 (2005).

[8] Interestingly, the trial judge specifically mentioned during an *in camera* colloquy with the attorneys that the date of the transfer to Russo was what triggered the statute of limitations. As she stated: "Because that's when it became very clear to the landowners in I'On that that parcel, CV-6, couldn't be given to them, regardless of any representations that the jury may find have been made, because it was gone then, and gone to a third-party."

Beginning in 1998, Developers produced a property report that promised to convey the Creek Club and the Community Dock to the HOA, upon their completion. Subsequently, Developers amended that report at least twice, changing the operative language to more vague terminology, specifically changing "Community Dock" to community docks. In February of 2000, ostensibly to pacify the Homeowners, the I'On Club entered into a recreational easement with the HOA, whereby the HOA was permitted use of the amenities and agreed to share costs of their upkeep.[9]

Substantial evidence was presented that although the initial plan—and promise—by Developers was to convey the disputed property to the HOA, Developers jettisoned that plan. In a March 2009 email, Thomas Graham's attorney, Jo Ann Stubblefield, explained that the 2000 recreational easement was granted because "in early 2000 the decision was made" to change course from the 1998 Property Report.[10] Rather than convey the properties at issue to the HOA, Developers decided they wanted the I'On Club to retain title, subject to an easement that provided for neighborhood use. Stubblefield then detailed the changes between the 1998 Property Report and subsequent iterations, including excepting the sidewalks and community dock from the properties to be conveyed to the HOA. However, rather than the I'On Club retaining title, in 2002 Lot CV-5 was conveyed to the Grahams for a nominal fee and that deed was recorded. At trial, Thomas Graham described the situation as "evolving." Another interpretation would be that Developers continued to change their position with regard to the disputed property in an apparent effort to pacify the HOA, thereby lulling the homeowners into believing that the property would eventually be theirs as promised.

Following the 2005 Handover Agreement, wherein Developers promised to inform the HOA when common areas were ready to turn over to HOA control, Besenfelder instead discussed other options with the Grahams. In April of 2007, Besenfelder sent the Grahams proposals for what to do with the Creek Club and

---

[9] However, as previously noted, the I'On Club did not have title to the properties when it executed the easement, instead receiving them from the I'On Company for the nominal fee of $5.00 in August of 2000. Additionally, while the easement was denominated "permanent[,]" subsequent language indicated that it would expire after thirty years.

[10] Thomas Graham forwarded this email to Bruce Kinney (then-president of the HOA), Russo, and Besenfelder with the message, "I think this explains why the community dock was not deeded to the [HOA.]"

docks, including "selling the Creek Club to the HOA[.]" Besenfelder listed the pros and cons of doing so, one pro being "[t]he HOA gets the infamous boat ramp and docks" and one con being the loss of a potentially valuable financial asset. He closed the email by suggesting the group "keep [these options] quiet for now[.]" In July, Besenfelder emailed the Grahams asking what the value of the Creek Club would be if it was repurposed and sold as a residential property, to which Thomas Graham replied, "[o]ur Creek Club is a potentially valuable asset… How can we capitalize this potential value?" Besenfelder then proposed limiting access, and Thomas Graham expressed concern that the homeowners had existing rights in the property.

Further evidence of this ever-shifting plan for the disputed properties surfaced in September of 2008 when Developers surreptitiously began the process of selling to a third party, Russo. Besenfelder, in an email titled "Creek Club, Please keep confidential[,]" informed Russo that the I'On Club had hired an accountant to perform the due diligence in advance of a sale. In this email to Russo, Besenfelder mentioned that I'On Club members get discounted use rates due to a preexisting agreement, but that he would "work with [other parties to] revise that agreement" and further informed Russo that, "the docks were promised to the homeowners and Vince [Graham] would like to honor that someday." In March of 2009 when Besenfelder seemed to express an intention not to turn over the docks, Russo inquired, "[d]oes this mean you're not going to turn over the docks???? Let me know ASAP[.]"

After the first deal with Russo fell through, an email from Besenfelder to the property manager, copying all Board members, again promised that the property would be conveyed, even mentioning that the property would be subdivided to accomplish this transfer. Nevertheless, as already noted, within hours of this email, secret negotiations began again with Russo, and the sale ultimately took place on August 5, 2009, the date on which the jury later found the statute of limitations was triggered.

As is clear from the recitation of the communications and events which transpired between the parties since the 1998 Property Report, when the HOA knew or should have known the Developers' promises were not going to be fulfilled was a question of fact for the jury, not one capable of being decided as a matter of law. We believe this case is similar in some respects to *Stoneledge at Lake Keowee Owners' Ass'n v. IMK Development Co., LLC*, 435 S.C. 176, 177, 866 S.E.2d 577, 578 (2021), where the Court implicitly acknowledged that although defendants in that case may have had a colorable argument as to the running of the statute of limitations, this Court nonetheless affirmed the jury's verdict. *See id.* ("Application

of both the basic three-year limitations period and the discovery rule in any given case can present factual issues for a jury to resolve. . . . [W]e are constrained by our standard of review and conclude that under the facts of this case, there was a jury issue as to whether the statute of limitations had expired by the time the action was commenced against [the defendant]"). In *Stoneledge*, the jury found in favor of the homeowners after the trial court denied defendants' motion for directed verdict based on the statute of limitations. As is the case here, there was a question of fact as to when Homeowners were put on notice.

Because ample evidence was presented supporting the jury's determination of when Homeowners were on notice, the jury's verdicts are reinstated. While there is an argument that the budgetary provision relied on by the court of appeals could have led to notice, the jury was cognizant of that argument but was convinced by the ample contrary evidence. That finding, because it was supported by sufficient evidence, should not have been overturned on appeal. Accordingly, we find that these claims are timely.

## II.     *Merits of the HOA's Breach of Fiduciary Duty Claim*

Homeowners argue Developers owed fiduciary duties to the HOA and that they breached these duties by not conveying the property, as well as by granting various easements over the property to third parties and in self-dealing by surreptitiously selling the property to Russo in 2009. Developers counter that their fiduciary duties to the HOA did not include a responsibility to convey the disputed property and therefore their sale to Russo did not constitute a breach. We agree with Homeowners that the court of appeals focused too narrowly on the Developers' failure to convey the disputed properties, ignoring the plethora of other evidence presented of the Developers' bad faith, broken promises, and self-dealing, all of which support the jury's verdict on Homeowners' breach of fiduciary duty cause of action.

Establishing a breach of fiduciary duty has three elements: (1) existence of the relationship, (2) breach of the duty owed to the Plaintiff, (3) damages proximately resulting from that breach. *See Turpin v. Lowther*, 404 S.C. 581, 589, 745 S.E.2d 397, 401 (Ct. App. 2013). Developers owe fiduciary duties to homeowners and homeowners' associations regarding common areas.[11] *Goddard v.*

---

[11] Generally, when a Developer turns over control of the HOA to its members by relinquishing its superior voting power, the fiduciary relationship is extinguished; the developer no longer has control over that which an HOA has an interest. *See*

*Fairways Dev. Gen. Partn.*, 310 S.C. 408, 415, 426 S.E.2d 828, 832 (Ct. App. 1993). Specifically, common areas must be conveyed in good repair and if they are not, sufficient maintenance funds must be provided in tandem with the property conveyance. *Id.* In *Concerned Dunes West Residents, Inc. v. Georgia-Pacific Corp.*, this Court likened this duty to those present in a business relationship, holding developers owe homeowners a duty, "much like that owed by promoters of a corporation to investors." 349 S.C. 251, 256, 562 S.E.2d 633, 636 (2002). Importantly, in subdivisions with common areas that are subject to covenants, the responsibilities outlined in the covenants control. *Cedar Cove Homeowners Ass'n, Inc. v. DiPietro*, 368 S.C. 254, 259, 628 S.E.2d 284, 286 (Ct. App. 2006).

More broadly, "it is [] well settled" that those in a fiduciary relationship with another party must not act to "make use of that relationship to benefit his own personal interests." *Lesesne v. Lesesne*, 307 S.C. 67, 69, 413 S.E.2d 847, 848 (Ct. App. 1991). Conduct that violates this mandate includes self-dealing, fraud, unconscionable conduct, misrepresentations, etc. *See Bennett v. Estate of King*, 436 S.C. 614, 633, 875 S.E.2d 46, 55 (2022) (Kittredge, J. dissenting). This makes sense because the fiduciary relationship imposes a "special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Id.* at 633, 875 S.E.2d at 56.

The trial judge consistently questioned whether Developers' argument—that nonconveyance is only a contractual issue rather than a potential breach of fiduciary duty—was too narrow. This occurred at the directed verdict stage, as well as in the

---

*Goddard v. Fairways Dev. Gen. Partn.*, 310 S.C. 408, 414, 426 S.E.2d 828, 832 (Ct. App. 1993) (finding that superior voting power by developers created a fiduciary relationship with condo-owners). However, those duties stem from developer control of the entity, the ongoing nature of construction, and the transfer of common areas. *See Concerned Dunes West Residents, Inc. v. Georgia–Pacific Corp.*, 349 S.C. 251, 260, 562 S.E.2d 633, 638 (2002) ("[T]he developer has a fiduciary duty to the POA to transfer common areas that are in good repair; if the developer transfers substandard common areas, the developer must, *at the time of transfer*, provide the POA with the funds necessary to bring the common areas up to a standard of reasonably good repair.") (emphasis added). Here, Developers maintained consistent veto authority over the board, continued construction in I'On until past the 2009 conveyance, and delayed the transfer of the disputed property, thereby continuing their fiduciary relationship with the HOA. These facts counteract any concerns that the fiduciary relationship was extinguished at the time of Developers' transfer to Russo.

court's order denying JNOV, where she stated, "a developer's failure to convey community properties in their entirety is at least the equivalent of conveying them in 'substandard condition' (if not worse), and thus, any distinction between properties which *should have been conveyed* and *properties which were actually conveyed in a substandard condition* is a distinction without a difference." However, the court decided to send this cause of action to the jury based not only on the nonconveyance but also on the evidence of bad faith and self-dealing that was presented, and the court denied Developers' motion for JNOV on that additional ground as well. In its second opinion, which reversed the jury's verdict on breach of fiduciary duty, the court of appeals pivoted and embraced the Developers' narrow approach, focusing only on the Developers' act of nonconveyance. *See Walbeck v. I'On Co., LLC*, 426 S.C. 494, 517, 827 S.E.2d 348, 360 (Ct. App. 2019) ("[T]he circuit court's denial of Appellants' JNOV motion was based on its extrapolation of a specific fiduciary duty to *convey title* to common areas from the duty pronounced in *Goddard* and *Dunes West*, i.e., the fiduciary duty to ensure common areas are in good repair before turning them over to a homeowners association.") (emphasis in original).

Homeowners argue this holding was unnecessarily and erroneously constricted, as the two relationships between Developers and the HOA—contractual and fiduciary—are inextricably intertwined. Under this analysis, the contractual duty to convey was overlaid by a fiduciary relationship, which means that while the nonconveyance was certainly a breach of contract, the subsequent self-dealing by Developers through the secret sale of the property to a third party constituted a breach of the Developers' fiduciary duties to the HOA. Stated differently, if the only evidence in the record of a breach of fiduciary duty was that Developers did not convey the property, that claim might well be limited to a breach of contract. While Developers urge this Court to focus only on the nonconveyance, Homeowners have never taken such a limited approach, nor did the trial court. Instead, there was sufficient evidence of bad faith, promises made and broken, and self-dealing presented *in addition to* the breach of contract, to warrant submission of the fiduciary claim to the jury. This nefarious conduct includes, but is not limited to, the secretive sale to Russo, the false representation regarding the property's rightful ownership, and the easement granted to third parties when the property had been promised to the HOA. This kind of conduct, by those in a fiduciary relationship, has clearly led to breaches in other cases and, though springing from contract in this case, constitutes breaches of fiduciary duty. *See, e.g.*, *Moore v. Moore*, 360 S.C. 241, 251, 599 S.E.2d 467, 472 (Ct. App. 2004) ("Parties in a fiduciary relationship must fully disclose to each other all known information that is significant and material, and when this duty to disclose is triggered, silence may constitute fraud.") (citation

omitted). Accordingly, we reverse the court of appeals and reinstate the jury verdict as to this cause of action.

## III. Derivative claims

The court of appeals dismissed Homeowners' derivative claims, finding the claims failed the requirements of Rule 23, SCRCP. There is a strong argument that the HOA's realignment as a plaintiff renders this issue moot. Nevertheless, because it seems the parties tried this case as derivative claims—as evidenced by Homeowners' opening and closing, arguments at the directed verdict stage, and the jury charge—we address the merits.

Shareholders of an organization may bring a derivative suit pursuant to Rule 23, SCRCP, in order to compel an organization to represent its interest through litigation. *Patterson v. Witter*, 425 S.C. 213, 231, 821 S.E.2d 677, 687 (2018). Generally, this occurs when the organization's leaders and directors have chosen, for whatever reason, to not act on their own to protect the organization's legal rights. Rule 23(b)(1), SCRCP, mandates:

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort.

*Id.* Accordingly, Rule 23, SCRCP, requires a plaintiff to set forth particularized allegations—a departure from the more liberal pleading requirements of Rule 8, SCRCP. *Carolina First Corp. v. Whittle*, 343 S.C. 176, 188, 539 S.E.2d 402, 409 (Ct. App. 2000). Pursuant to Rule 23, a shareholder plaintiff must either make a demand on the entity that it pursue a claim or plead with particularity the exceptional circumstances that demonstrate why making a demand would be futile. *Id*. A demand made on a corporation must (1) identify the alleged wrongdoers, (2) describe the factual basis of the wrongful acts and the harm caused to the corporation, and (3) request remedial relief. *Patterson*, 425 S.C. at 233-34, 821 S.E.2d at 688. In

reviewing these requirements, the trial court is neither limited to considering only the allegations put forth in the complaint nor precluded from considering a pre-suit demand letter that was not expressly incorporated by reference into the complaint. *Patterson*, 425 S.C. at 234-35, 821 S.E.2d at 688-89.

Here, in denying Developers' JNOV motion, the trial court stated, "by virtue of the verdict and monetary awards rendered in favor of the [HOA], it is clear that the representative [Homeowners] prosecuted this action in an effort to preserve *all* I'On lot purchasers' common interest in the amenity property." Further, the trial court specifically found that the homeowners made repeated demands, and even if they had not, a demand would have been futile since Developers had veto power on the HOA board. *Grant v. Gosnell*, 266 S.C. 372, 376, 223 S.E.2d 413, 415 (1976) ("In evaluating the 'excuse' allegations in a derivative suit, 'Courts have generally been lenient in excusing demand.'") (quoting *DeHaas v. Empire Petroleum Co.*, 435 F.2d 1223 (10th Cir. 1970)). We find the trial court properly denied JNOV because even if no formal demand was made, any attempt to do so would have been futile in light of the Developers' remaining control of the HOA through its veto power. Indeed, Thomas Graham conceded he had previously stated in his deposition that this veto power was like being on the "Supreme Court."

Moreover, after the HOA was realigned as a plaintiff, utilizing a derivative action makes little sense. The HOA is a party to this litigation and acting on the same side as the purported interested members, regardless of their success or failure to compel suit through a derivative action. Thus, the only purpose of the derivative suit—compelling the HOA to join as a plaintiff—has been accomplished. *See Lennon v. S.C. Coastal Council*, 330 S.C. 414, 415, 498 S.E.2d 906, 906 (Ct. App. 1998) ("A threshold inquiry for any court is a determination of justiciability, *i.e.* whether the litigation presents an active case or controversy."); *see generally Smith v. Sperling* 354 U.S. 91, 95 (1957) (finding that realignment of a corporate plaintiff in a derivative action defeated subject matter jurisdiction). Accordingly, the court of appeals' dismissal of the HOA's claims is reversed.

### IV.    Amalgamation/Single-Business Enterprise Theory

Homeowners contend the court of appeals erred in reversing its original opinion that the trial court did not err in amalgamating the interests of the various entities. Homeowners assert the court of appeals should not have applied the single-business entity test set forth by this Court in *Pertuis*, but even if *Pertuis* applies, amalgamation is appropriate because there is ample evidence of exploitative and evasive conduct resulting in unfairness. Additionally, Homeowners argue

Developers waived the question of amalgamation by asking the trial court to decide the issue before sending the case to the jury. Homeowners also contend that even if the parties should not have been amalgamated, Developers cannot establish material prejudice, and therefore it was error for the court of appeals to remand for a new trial.

Conversely, Developers argue they did not waive any challenge to the amalgamation ruling since that is an issue for the trial court to answer in the first instance and may be appealed. As to the merits, Developers contend the court of appeals correctly recognized that amalgamation is the exception, not the rule. Accordingly, Developers argue Homeowners' failure to show a causal connection between any bad faith or improper conduct and the mixing of several different corporate entities precludes treating the various Developers as one. Developers assert the court of appeals properly concluded the trial court's erroneous amalgamation ruling prejudiced them, and therefore, the new trial remedy was correct.

In *Pertuis*, the Court formally adopted the single business enterprise theory as one method of piercing the corporate veil. *Pertuis v. Front Roe Rests., Inc.*, 423 S.C. 640, 655, 817 S.E.2d 273, 280 (2018). There, a restaurant manager who was a minority shareholder filed suit against the majority shareholders for being "squeezed out" of the business, which actually consisted of three S-corporations. The trial court determined the three entities constituted a "de facto partnership" and amalgamated the interests. In formally adopting the single business enterprise theory, the Court acknowledged the practical reality that businesses often form different corporate structures as a means of shielding shareholders from liability—"there is nothing remotely nefarious in doing that." *Id.* at 655, 817 S.E.2d at 280-81. Accordingly, the Court required two elements before amalgamating different interests into one under the single business enterprise theory: 1) "the various entities' operations are intertwined" and 2) "further evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions." *Id.* The Court placed the burden on the party seeking to pierce the corporate veil and also cautioned that deciding whether to amalgamate various entities should only be done upon "substantial reflection." *Id.* ("As with other methods of piercing the corporate form that have previously been recognized in South Carolina, equitable principles govern the application of the single business enterprise remedy, and this doctrine 'is not to be applied without substantial reflection.'" (citation omitted)). After formally adopting this test, the Court concluded the trial court erred in amalgamating the three entities because there was no evidence of bad faith by the majority shareholders.

While *Pertuis* involved a claim of minority shareholder oppression, this Court applied *Pertuis* in a construction defect case where a homeowner's association sought to amalgamate various entities structured as limited liability companies. *Stoneledge at Lake Keowee Owners' Ass'n, Inc. v. IMK Dev. Co., LLC*, 435 S.C. 109, 866 S.E.2d 542 (2021). The Court reversed the trial court's "decision" to amalgamate the various LLCs that employed the investors, construction contractors, and sales team for a residential property development.[12] A principal of the construction contractor had knowledge of construction defects plaguing the project while working with another intertwined sales entity. The various LLCs shared members, and homeowners testified they were confused as to the different roles that each LLC and individual played. In declining to amalgamate the LLCs, the Court noted that it viewed the facts "with the requisite hesitancy to invade the LLC form . . . ." *Id.* at 126, 866 S.E.2d at 551. The Court reviewed the record de novo and concluded that the only evidence of "bad faith, abuse fraud, wrongdoing, or injustice" was the fact that the profits of the developer, who had constructive notice of construction defects, were "entirely dependent" on the sales entity's ability to sell units. *Id.* at 119, 126, 866 S.E.2d at 548, 551 (2021). Accordingly, amalgamation was not appropriate.

In denying Developers' JNOV motion, the trial court concluded that any distinctions between the various entities were blurred, as all were "controlled, managed, and owned by the same individuals, and all collectively functioned as one in the day-to-day operations" of the I'On development, "including promulgating deceptive and misleading representations." Additionally, although the trial court did not have the benefit of the *Pertuis* decision at the time it denied Developers' JNOV motion, some of the court's findings still demonstrate more than that the various entities were simply intertwined. For example, the trial court noted that the recreational easement, which was entered into between the I'On Company, the I'On Club, and the HOA in 2000 was executed on behalf of all three entities by the general manager of the I'On Company. Nevertheless, a subsequent general manager of the I'On company informed the HOA in 2009 that the I'On Company was preparing to deed the property containing the community dock to the HOA despite the fact that the I'On Club, not the I'On Company, owned the property. The trial court also recounted how lots CV-5 and CV-6 were transferred between the I'On Company to

---

[12] As the Court noted, the trial court never reached the merits of the claim, instead simply denying a directed verdict motion on the issue but not revisiting it. Nevertheless, because the question of amalgamation lies in equity and the parties, as well as the court of appeals, all treated the issue as being decided on the merits, the Court reached the matter. *Stoneledge*, 435 S.C. at 120, 866 S.E.2d at 548.

the I'On Club in 2000 for $5, CV-5 was transferred two years later to the owners of the I'On Company for $5, although there was no evidence that consideration was actually paid to the I'On Club. In its initial opinion, the court of appeals agreed with the trial court's amalgamation ruling but reversed in its substituted opinion, concluding there was no evidence of "bad faith, abuse, fraud, wrongdoing, or injustice *resulting from* the blurring of the entities' legal distinctions."

We find the court of appeals correctly analyzed this issue initially, and erred in its second opinion by adopting Developers' limited view of the test set forth in *Pertuis*. While it is true that courts should be hesitant to invade the corporate form, here there is more than enough evidence that the creation of various entities furthered Developers' abilities to refrain from doing that which they repeatedly told the HOA and the residents they would do—turn over the disputed amenities to the HOA. As this Court stated in *Pertuis*, "the corporate structure should not shield—fraud, *evasion of existing obligations*, circumvention of statutes, monopolization, criminal conduct, and the like." 423 S.C. 640, 654-55, 817 S.E.2d 273, 280 (quoting *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008)) (emphasis added).

The 1998 Property Report specifically provided that the HOA would own the dock and park once the development was completed. Then, within a year, the plan changed, as Developers decided not to convey the amenities, including the community dock, completely disregarding the 1998 Property Report. Next, Developers attempted to change from outright HOA ownership to mere HOA access by granting the HOA a recreational easement, despite not actually owning the property at the time. In an amended property report in 2000, the community dock was removed from the list of amenities owned by the HOA, thus purporting to accomplish the change from ownership to access without any input or consideration of the interests of the residents and the HOA. Between 2006 and 2007, Developers had yet to turn over the community dock or boat ramp, and openly acknowledged that "[t]he docks are too controversial and taking away even part of this community amenity would cause trouble." Shifting course again, in 2008, Besenfelder wrote, "We are ready to deed this community dock and ramp to the homeowners and wish to comply with regulations."

Ultimately, Developers reversed themselves yet again, and decided to sell the docks to Russo without informing the HOA because they wanted to "keep the transaction quiet because of all the brew ha hah (sic) and filings." Developers even went a step further when, instead of disclosing the outright sale of the properties to Russo, they told Kinney that Russo was simply taking over management of the lots

and amenities. Thus, under our de novo review of this issue, the evidence shows that not only were the various entities intertwined and acting in concert with each other, their conduct demonstrates "bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions." *Pertuis*, 423 S.C. at 655, 817 S.E.2d at 280-81. Although the jury elected not to award punitive damages in this case, its verdict did include a finding that the Developers' conduct was "willful and wanton."[13] Accordingly, we find the court of appeals erred in declining to apply the single-business enterprise theory. Because the trial court did not err in amalgamating the different entities, there is no need for a remand.[14]

## CONCLUSION

Based on the forgoing, we: (1) reverse the court of appeals' ruling on the statute of limitations because the issue as to when Homeowners had adequate notice

---

[13] Moreover, we note that following the verdict, the trial court issued an order—from which the Developers did not appeal—holding them in contempt for their destruction of evidence. The trial court pointed out specific examples of documents that were deleted, and noted that the forensic report revealed that "Besenfelder deleted approximately *51,527 files and folders*[.]" The trial court ultimately awarded over $23,000 in sanctions.

[14] In Developers' cross-petition for certiorari, they assert the court of appeals erred in relying on the two-issue rule in upholding the trial court's finding that the 2000 recreational easement was invalid. As to the merits, Developers contend the after-acquired title doctrine applies and that the easement was perpetual rather than limited to 30 years. While we agree the two-issue rule applies and affirm the court of appeals on this issue, we do so for a different reason. Regardless of whether the lack of an arms-length transaction constituted a separate ground in the trial court's order, the court specifically noted, "Additionally, the Doctrine of Unclean Hands precludes Developers from relying upon equitable principles such as the After-Acquired Title Doctrine because, in order to recover in equity, one must act equitably." Developers have not addressed this equitable basis supporting the trial court's decision, so it is the law of the case. *See Jones v. Lott*, 387 S.C. 339, 346, 692 S.E.2d 900, 903 (2010) ("Under the [two-issue] rule, [when] a decision is based on more than one ground, the appellate court will affirm unless the appellant appeals all grounds because the unappealed ground will become the law of the case."). In any event, we agree with the trial court that because Developers acted inequitably, we do not need to reach whether the after-acquired title doctrine could apply in this case.

to begin the limitations clock was properly presented to the jury and resolved by it; (2) find any procedural issues related to the derivative claims either (a) moot as the HOA was realigned as a plaintiff and the trial court explicitly found it adopted its own claims against the Developers, or (b) demand was saved by futility due to the Developer's continuing veto power; (3) hold that Developers breached the fiduciary duties owed to Homeowners; (4) reverse the court of appeals' decision that Developers could not be amalgamated, as there is more than enough evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions; and (5) affirm the court of appeals that the recreational easement was invalid.[15]

**AFFIRMED IN PART; REVERSED IN PART.**

**KITTREDGE, Acting Chief Justice, FEW, JAMES, JJ., and Acting Justice Jan B. Bromell Holmes, concur.**

---

[15] Before the circuit court, Walbeck claimed attorney's fees under his statutory ILSA claim. *See* 15 U.S.C.A. § 1709(a)-(c) (2012) ("The amount recoverable . . . may include, in addition to matters specified [in this section] interest, court costs, and reasonable amounts for attorneys' fees . . . ."). The trial court found both that Walbeck could recover attorney's fees under ILSA and that his claim for more than $1 million was unreasonable, reducing the fee by over 75%. *See Farmers & Merchants Bank v. Fargnoli*, 274 S.C. 23, 26, 260 S.E.2d 185, 187 (1979) ("The law requires, however, that the award must be reasonable."). Though Developers challenged this claim before the court of appeals, its ultimate finding that the ILSA claim was barred was dispositive. Rather than remanding to the court of appeals, because we agree with the trial court's analysis on this issue and we reinstate the jury's verdict as to the timeliness of Walbeck's claims, the attorney's fees award of $225,500 to Walbeck is likewise reinstated.